IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jack A. Thayer,                                                         Case No. 3:05CV7275

          Plaintiff

     v.                                                                        ORDER

Fuller & Henry, Ltd., et al.,

          Defendants

     Plaintiff Jack Thayer brings this legal malpractice suit against his former attorneys, defendants Fuller & Henry, Ltd. (Fuller & Henry) and David R. Bainbridge. Pending is defendants' summary judgment motion, in which defendants argue that Thayer's action is barred by Ohio's one-year statute of limitations on legal malpractice actions. Because I conclude that a genuine issue of material fact exists as to when the attorney-client relationship between Thayer and defendants terminated, defendants' motion shall be denied.

**Background**

     In September, 1999, Thayer retained Bainbridge, an attorney at Fuller & Henry, to handle legal matters relating to Thayer's early retirement and separation from AVCA, an engineering firm in which Thayer held a significant number of shares. Thayer claims that Bainbridge committed malpractice by failing to secure, as part of his severance package, a release of Thayer's personal guaranty of a loan made by KeyBank to AVCA on September 14, 1995.

1

After an initial telephone conference, Thayer provided defendants with a packet of documents related to the AVCA matter. Shortly thereafter, Thayer and Bainbridge met in person.

On November 2, 1999, Thayer and AVCA signed a Termination Agreement and General Release ("termination agreement"). Part of the termination agreement required AVCA to make substantial monthly payments to Thayer.

In August 2000, Thayer contacted Bainbridge after receiving a letter from AVCA dated August 2, 2000, indicating that AVCA would be defaulting on the payments owed to Thayer under the termination agreement.

In October 2000, KeyBank notified Thayer that he had not been released from AVCA's loans with KeyBank.

Defendants last billed Thayer for legal services performed on his behalf on October 30, 2003. Since that date, Thayer has not sought professional advice from the defendants.

In either January or February, 2004, Mary Kay Thayer, Thayer's wife, met attorney Erik Chappell at a Lions Club meeting in Erie, Michigan. During their conversation, Ms. Thayer learned that Chappell was an attorney. Ms. Thayer told Chappell that her husband had retired from a large local engineering firm that had defaulted on its obligations under his retirement agreement. As the meeting concluded, Ms. Thayer asked Chappell if he would be willing to speak with Mr. Thayer. Chappell then gave Ms. Thayer his business card. Ms. Thayer returned home and encouraged Thayer to call Chappell.

On February 9, 2004, Thayer and Chappell had an initial phone conversation.

On February 11, 2004, Thayer met with Chappell to discuss issues related to AVCA. Chappell informed Thayer that Chappell was willing to review documents and provide his

professional opinion on the AVCA matter, but that he did not provide free consultations. Chappell also informed Thayer that he would not represent Thayer while Thayer continued to employ defendants.

For several weeks thereafter, Chappell reviewed Thayer's documents relating to AVCA and had several conversations with Thayer regarding AVCA settlement negotiations. Thayer and Chappell also discussed the quality of defendants' representation, including the possibility that Thayer could bring a legal malpractice claim against them.

Chappell billed and Thayer paid Chappell's standard hourly rate for the services Chappell rendered during February and March, 2004.

Thayer sent Dean Diver, then-president of AVCA, a letter dated February 13, 2004, in anticipation of an upcoming meeting with Diver. Thayer copied Chappell, but not the defendants, with this letter, which discusses AVCA-Thayer settlement negotiations.

On March 17, 2004, Chappell participated in a conference call with Patricia Fugee, an attorney for AVCA.

On March 21, 2005, Thayer and defendants entered into a tolling agreement (the "tolling agreement") under which defendants agreed to toll any cause of action by Thayer against defendants from the date of the execution of the tolling agreement (March 21, 2005) until May 31, 2005.

On or after March 26, 2004, Thayer contacted Chappell and indicated he wanted to retain Chappell as his legal counsel.

Patricia Fugee sent Chappell a letter dated March 30, 2004, which outlined a proposal to resolve Thayer's claims against AVCA.

3

On March 30, 2004, Thayer sent a letter to Bainbridge expressing a loss of confidence in Fuller & Henry and his intention not to pay his outstanding balance of $2,550. Thayer thereafter informed Chappell that he had mailed that letter to defendants.

In response to Thayer's March 30, 2004 letter, Bainbridge sent Thayer a letter dated April 14, 2004. The letter stated:

> It is my understanding from your letter that you have already, or will be shortly, obtaining new legal counsel for any and all matters for which Fuller & Henry Ltd. had previously represented you, and that we are to cease any further legal work on your behalf immediately. Please advise us in writing immediately if this was not your intent.

(Doc. 38, Ex. I.)

Thayer filed suit against defendants in the Common Pleas Court of Lucas County, Ohio, on May 27, 2005, while the tolling agreement was in effect. Defendants removed this action to this court on July 1, 2005.

## Standard of Review

Summary judgment is proper if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine which facts are material – those that might affect the outcome of the suit – a court must look to the substantive law to be applied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Id*. If the dispute about a material fact is genuine (if the evidence is such that a reasonable jury could return a verdict for the non-moving party), summary judgment must be denied. *Id.*

## Discussion

A legal malpractice claim must be filed within one year of the time the cause of action accrues. O.R.C. § 2305.11(A). Under that provision, an action for legal malpractice accrues at

4

the later of the: 1) "discovery date," the date on which a cognizable event causes (or should cause) the client to discover that the lawyer's acts or failure to act resulted in injury; or 2) "termination date," the date on which the attorney-client relationship for that particular transaction or undertaking ends. *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St. 3d 54 (1989) (citing *Omni-Food & Fashion, Inc. v. Smith*, 38 Ohio St. 3d 385 (1988)); *Dzambasow v. Abakumov*, 2005 WL 3475792, at *4 (Ohio App.).

There is no dispute that Thayer knew that defendants may have committed malpractice more than a year before he filed suit. The dispositive issue is, thus, whether termination of the professional relationship between Thayer and the defendants likewise occurred outside the limitations period.

The tolling of the one-year statute of limitations for legal malpractice actions during the period of the attorney-client relationship is known as the "continuous representation" doctrine. *See Vail v. Townsend*, 29 Ohio App. 3d 261, 261 (1985). The court in *Vail* described the rationale for the continuous representation doctrine as follows:

> It should not be the purpose of the law to discourage professional relationships. Where a lawyer makes a mistake in the representation of his or her client, no purpose is served by a policy of law that says, in effect, that the client should be penalized for permitting the attorney to correct his or her mistake rather than sue the attorney upon discovery of the mistake, thereby ending the relationship and the attorney's opportunity to correct his or her error . . . . There are many errors that may be committed by a professional person. To hold that a client must hastily file a claim against an attorney for every error that can be made, in our judgment, serves no purpose. If the statute of limitations is tolled until the lawyer-client relationship terminates, both the client and the lawyer benefit from such a rule because the client has more time in which to bring his or her claim and the lawyer has an opportunity to correct an error.

29 Ohio App. 3d at 263.

The attorney-client relationship is consensual in nature and may be terminated by either party. *Artromick Int'l, Inc. v. Drustar, Inc.*, 134 F.R.D. 226, 229 (S.D. Ohio 1991) (citing *Brown v. Johnstone*, 5 Ohio App. 3d 165 (1982)).

A client may terminate the relationship at any time. *Columbus Credit Co. v. Evans*, 82 Ohio App. 3d 798, 804 (1992) (citing *Ross v. Woyan*, 1 Ohio App. 3d 39, 41 (1980)). An attorney, however, may not withdraw from the attorney-client relationship absent notice to his or her client and, if mandated by applicable court rules, permission from the court. *Id.* at 804 (citing Ohio Code of Professional Responsibility, DR 2-110(A)). Defendants do not – and, indeed, cannot – argue that they terminated their attorney-client relationship with Thayer, as they never notified him that they intended to withdraw as counsel.

"[T]he date of termination of the attorney-client relationship is a question of fact and is to be determined by considering the actions of the parties."  *Smith v. Conley*, 109 Ohio St. 3d 141, 144 (2006) (citing *Omni-Food*, 38 Ohio St. 3d at 388).

In determining whether a genuine issue of material fact exists as to the termination date of an attorney-client relationship, Ohio courts distinguish between two categories of cases: 1) those in which an affirmative act by the attorney or client clearly signals his or her intention to end the parties' professional relationship; and 2) those in which neither the attorney nor client exhibits a clear intention to terminate the relationship, but continuing to "bind the parties to each other" would be "objectively unreasonable," *Artromick*, 134 F.R.D. at 230; *see, e.g., Busacca v. Maguire & Schneider, L.L.P.,* 162 Ohio App. 3d 689, 694-96 (2005); *Trickett v. Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A.*, 2001 WL 1301557, at *3 (Ohio App.).

An attorney or client's "affirmative act" may terminate the attorney-client relationship. *Chapman v. Basinger,* 71 Ohio App. 3d 5, 10 (1991) (quoting *Mastran v. Marks*, 1990 WL 34845, at *4 (Ohio App.) (internal quotation marks omitted); *see also Artromick,* 134 F.R.D. at 230 (noting that because mutual subjective intent suffices to create and maintain an attorney-client relationship, a client's or attorney's declaration by word or deed is sufficient to end the relationship); *Busacca,* 162 Ohio App. 3d at 694-96 (concluding that: 1) sending of letters by plaintiff-clients to defendant-attorneys might constitute affirmative acts terminating relationship; and 2) defendant-attorneys' voluntary dismissal of lawsuit and failure to refile might constitute termination of case "on its own"); *Trickett*, 2001 WL 1301557, at *3 (Ohio App.).

A defendant-attorney's summary judgment motion on statute of limitations grounds may be based on unequivocal evidence of an affirmative act terminating the relationship:

> In determining when the attorney-client relationship is terminated, the court must point to an affirmative act by either the attorney or the client that signals the end of the relationship. *Mastran v. Marks* (Mar. 28, 1990), Summit App. No. 14270, unreported, 1990 WL 34845. For a trial court to take this issue away from a jury, such an act must be clear and unambiguous. *Id.*

*Mobberly v. Hendricks*, 98 Ohio App. 3d 839, 843 (1994).

Where, however, there has been no clear-cut affirmative act by the attorney or client terminating the attorney-client relationship, a court may examine the record to determine whether the relationship has terminated "on its own." *See Busacca,* 162 Ohio App. 3d at 695; *see also Markham v. Brandt*, 2006 WL 783464, at *4 (S.D. Ohio 2006). Termination in the absence of a manifestly affirmative act "may occur when the underlying action has concluded or when the attorney has exhausted all remedies in the case and had declined to provide additional

7

legal services on related issues." *Busacca*, 162 Ohio App. 3d at 695; *Trickett,* 2001 WL 1301557, at *3 (Ohio App.) (rejecting doctrine that only an affirmative act can terminate the relationship for statute of limitations purposes). Where a manifest "affirmative act" is lacking, the court may consider evidence of the parties' subjective intent and the reasonable expectations of attorneys and clients in general. *See Artromick,* 134 F.R.D. at 230.

Thayer and the defendants dispute which of two events – in essence, which of two "affirmative acts" – terminated the attorney-client relationship between them: 1) Thayer's communications with Chappell regarding both the AVCA matter and possible malpractice by defendants; or 2) Thayer's mailing of the "no confidence" letter to defendants.

A jury could reasonably conclude that either of these events terminated the parties' attorney-client relationship.

Defendants argue that Thayer terminated the attorney-client relationship when: 1) he "hired" Chappell to represent him on the same subject matter on which defendants had been representing Thayer; and 2) he "consulted" with Chappell about filing a malpractice claim against defendants. Defendants submit that Thayer's "hiring" of Chappell constituted an affirmative act demonstrating the final breakdown of the attorney-client relationship between the parties.

As evidence of Thayer's intent to terminate his relationship with Fuller & Henry, defendants rely, *inter alia*, on statements from Thayer's deposition, Chappell's billing records, Thayer's cell phone records, and descriptions of communications between Thayer and Chappell beginning February 11, 2004, and continuing for several weeks thereafter. Defendants maintain

that this evidence overwhelmingly establishes that no later than February, 2004, Thayer had substituted Chappell for Fuller & Henry as his legal counsel.

Pointing to three documents – 1) Chappell's affidavit; 2) Thayer's March 30, 2004, "no confidence" letter; and 3) defendants' April 14, 2004, letter acknowledging receipt of Thayer's "no confidence" letter – Thayer responds that he "did nothing more than seek a consultation from Mr. Chappell on a very complicated and expansive matter." (Doc. 38, at 15).

While a lack of trust may lead to the termination of the attorney-client relationship, that lack of trust and confidence does not necessarily signal termination of the relationship. *R.E. Holland Excavating, Inc. v. Martin, Browne, Hull & Harper, P.L.L.*, 162 Ohio App. 3d 471, 475 (2005) (holding that trial court erred in concluding that attorney-client relationship likely terminated when plaintiff-client's attorney in separate but related second action sent defendant-attorney letter indicating that plaintiff-client believed defendant-attorney negligently represented plaintiff-client in first action).

The court in *R.E. Holland* explains that "[a]lthough an attorney-client relationship is ideally characterized by the client's reposing trust and confidence in the attorney, this is not always the case." *Id.* at 474 (dictum). For example, an insurance carrier may retain an attorney to represent its insured, who, "despite lacking confidence in counsel, is without the means to hire independent counsel." *Id.* at 475 (dictum).

Here, a jury could reasonably interpret Thayer's association with Chappell as a thorough consultation in a complex case stemming from Thayer's loss of confidence in defendants. While Thayer had the resources to seek the opinion of an additional attorney, his "sunk costs" were significant and may have warranted, in Thayer's mind, a continuation of an imperfect

9

relationship with his current attorneys. As Thayer explains, because he had spent approximately $45,000 in legal fees by the time he met Chappell, replacing the defendants and bringing new counsel "up to speed" was "not a consideration." (Doc. 73, at 9 n.5.)

Chappell testified that Thayer approached Chappell about being co-counsel with defendants, a proposal that Chappell rejected. (Doc. 73, at 9 (citing Doc. 38, Ex. G).)[1] Thus, Thayer may have been seeking a second opinion – not substitute counsel – and may have considered adding Chappell to his current team of attorneys. Likewise, Thayer may have considered giving defendants a chance to correct their mistake.

Certain activities by newly *retained* attorneys may constitute affirmative acts terminating the original attorney-client relationship. *See, e.g., Burzynski v. Bradley & Farris Co., L.P.A.*, 2001 WL 1662042, at *4 (Ohio App.) (dictum) (attorney-client relationship possibly ended when defendant-attorneys notified plaintiff-client they would no represent him and client thereafter picked up his file; relationship unquestionably ended when plaintiff-client retained new counsel who filed lawsuit involving the same subject matter); *DiSabato v. Tyack & Assocs. Co.*, 1999 WL 715901, at *3 (Ohio App.) (newly retained attorney filed lawsuit involving the same subject matter on which defendant-attorney had been representing plaintiff-client).

A plaintiff-client's consultation with another attorney, however, does not necessarily terminate the client's relationship with the original attorney. *See, e.g., Chapman v. Basinger*, 71 Ohio App. 3d 5, 9 (1991) ("[S]imply talking to another lawyer will not break a previous attorney-client relationship"); *Feudo v. Pavlik*, 55 Ohio App. 3d 217, 219 (1988) ("Mere

---

[1] Exhibit G makes, however, no reference to any such request by Thayer.

discussions with a second lawyer about a case . . . unbeknownst to the first lawyer, do not signal the termination of the attorney-client relationship with the first lawyer").

Plaintiffs argue that prior to defendants' receipt of Thayer's March 30, 2004 "no confidence" letter, "[d]efendants still very much considered themselves Mr. Thayer's counsel and had no reason not to." (Doc. 38, at 16.) In their April 14, 2004 response to Thayer's "no confidence" letter, defendants ask Thayer to confirm their understanding of Thayer's intended effect of his "no confidence" letter: "that [defendants] . . . cease any further legal work on [Thayer's] behalf immediately." (Doc. 38, Ex. I.)

Logically, the defendants cannot "cease" an activity they do not currently perform. Thus, a jury could reasonably conclude that the "no confidence" letter – *not* Thayer's association with Chappell – is the first clear "affirmative act" by Thayer signaling to the defendants his desire to terminate their attorney-client relationship completely.

Thayer does not dispute that he discussed with Chappell his AVCA severance package – a matter on which defendants had previously advised Thayer. Nor does Thayer dispute that he and Chappell discussed the quality of defendants' representation, including the possibility that Thayer might pursue a malpractice claim against defendants.

It remains a question of fact, however, whether Thayer's interactions with Chappell, combined with his complete lack of contact with defendants since the preceding October, constitute an "affirmative act" sufficient to terminate the parties' attorney-client relationship. The answer to this question requires credibility determinations, weighing of evidence, and the drawing of legitimate inferences from the facts, which are all jury functions, not those of a judge. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Because a genuine issue of material fact

exists as to when the attorney-client relationship between Thayer and defendants terminated, defendants' motion shall be denied.

## Conclusion

For the foregoing reasons, it is therefore

ORDERED THAT defendants' motion for summary judgment be, and the same hereby is denied. A pretrial conference is scheduled for April 30, 2007 at 3:00 p.m.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge
